THE ANNA NATIONAL BANK, Plaintiff-Counterdefendant and Supplemental Plaintiff-Appellee, v. GILBERT L. PRATER, JR., *et al.*, Defendants-Counterplaintiffs (Goreville State Bank *et al.*, Supplemental Defendants-Appellants).

Fifth District No. 5—85—0814

Opinion filed April 9, 1987.

8

Terry Sharp, of Law Office of Terry Sharp, P.C., of Mt. Vernon, for appellants Goreville State Bank and Noble White.

R. Corydon Finch, of Anna, for appellee.

JUSTICE JONES delivered the opinion of the court:

Plaintiff, Anna National Bank (ANB), brought the instant supplementary action following a foreclosure action in which its mortgages on certain farm property in Union County, Illinois, were foreclosed against defendants, Gilbert and Nancy Prater (Praters). ANB had sought and obtained an order in the foreclosure proceeding placing it in possession of the subject property. In its supplementary action ANB sought a declaration of its rights to a crop of soybeans growing on the foreclosed property at the time the order of possession was entered. Joined as defendants in the supplementary action were Noble White, a farm tenant of the Praters who had planted the soybeans in question, and Goreville State Bank (GSB), which had loaned money to Noble White for production of the soybeans and had taken a security interest in the soybean crop. Also joined as a defendant was Behiemer & Kissner, Inc. (B&K), a grain elevator, which held the proceeds of the crop claimed by the parties. The trial court entered summary judgment in favor of ANB, finding that the interest of ANB in the soybean crop as "rents, issues and profits" of the property subject to ANB's mortgages was superior to the interests of supplemental defendants Praters, Noble White, and GSB. On appeal supplemental defendants Noble White and GSB assert that their rights to the crop in question were not concluded by the trial court's order placing ANB in possession of the mortgaged premises where they were not joined as parties in the main foreclosure proceeding in which it was entered. In addition, they contend that the trial court erred in entering summary judgment for ANB where GSB had a superior claim to the soybean crop as a current year crop lender under section 9—312(2) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, par. 9—312(2)) and where a material question of fact existed as to the validity of the farm lease between Noble White and the Praters. We reverse and remand the cause for further proceedings.

On June 7, 1984, ANB filed a complaint to foreclose its mortgages on four tracts of property in Union County, Illinois, owned by mortgagors Gilbert and Nancy Prater. Each of the mortgages specifically entitled the mortgagee, upon default, to "all rents, issues, proceeds and profits" of the real estate subject to the mortgages. On July 11, 1984,

the Praters filed an answer in which they alleged, *inter alia,* "that the property has been leased for farming purposes to Noble White and that the same are [*sic*] being occupied for the purpose of planting crops." No joinder of Noble White as a defendant was made, and, on August 22, 1984, ANB filed an application to be placed in possession of the mortgaged premises. (See Ill. Rev. Stat. 1983, ch. 110, par. 15—301 *et seq.*) In its application ANB alleged that "the mortgaged premises are occupied, according to *** the answer of defendants Prater, pursuant to a lease for farming purposes[,] to Noble White for the purpose of planting crops." On September 17, 1984, the trial court granted ANB's application to be placed in possession. The court observed that notice of the application to be placed in possession had been given to the "owner" of the premises and that the mortgagee's application to be placed in possession had not been denied under oath by the defendants Praters. See Ill. Rev. Stat. 1983, ch. 110, par. 15—303.

Subsequently, on September 23, 1984, ANB filed a motion for entry of a temporary restraining order (TRO) without notice. In its motion ANB alleged that at the time the mortgagee's application to be placed in possession had been granted, a soybean crop had been growing on the mortgaged premises and:

"on Friday, September 21, 1984, and Saturday, September 22, 1984, during the hours of night, defendants [Praters] harvested or caused to be harvested, or someone by or on their behalf using their equipment harvested or caused to be harvested[,] approximately 100 acres of the soybean crop, thereby violating [the order placing mortgagee in possession]."

ANB further alleged:

"Noble White is admitted in the pleadings *** by defendants' Prater[s] to have been a lessee of the premises; there is no written lease on file whatsoever and no written lease or other basis for the interest of the mortgagor or the mortgagor's lessee to have priority *** over the interest *** of [ANB]."

ANB, therefore, sought entry of an order restraining the Praters and Noble White, as well as those acting in concert with them, from entering upon the mortgaged premises or severing or attempting to sever or harvest any soybeans from the premises. On September 23, 1984, the trial court granted ANB's motion of that date and entered the TRO requested by ANB.

On September 28, 1984, ANB filed a motion for summary judgment for foreclosure of its mortgages and for sale of the mortgaged premises. Subsequently, on October 1, 1984, Noble White filed a peti-

tion for leave to intervene as a party defendant in the foreclosure proceeding and a motion to dissolve the TRO of September 23, 1984, insofar as it applied to him as lessee of the subject premises. Accompanying both motions was a document entitled "Farm Lease," which purported to be a written farm lease entered into on May 10, 1984, between the Praters and Noble White. The term of the lease was stated to be from May 10, 1984, to December 31, 1984, and the lease provided that the tenant "agrees to use the land and machinery [described in the lease] for agricultural purposes and to pay as rent the sum of $60,000.00 no later than June 15, 1984." The real estate described in the lease included the four tracts of property in Union County that were the subject of ANB's foreclosure proceeding.

In his petition to intervene and his motion to dissolve the TRO, Noble White alleged that he was a lessee of the subject property pursuant to the written lease with the Praters, that the lease was in effect at the time the mortgagee ANB was placed in possession of the property, and that Noble White, by reason of the lease, had a superior right to the soybean crop growing upon the premises when the order of possession was entered. Noble White sought, therefore, to have the TRO dissolved as to him so that he could enter upon the property to harvest the soybean crop and have the monies from the sale of the soybeans released to him.

At a hearing on the motions held on October 1, 1984, Noble White testified that he was a son-in-law of the Praters and that he had farmed land owned by them in Union County and Johnson County pursuant to the farm lease entered into on May 10, 1984. Prior to planting crops on the leased premises in May or June 1984, Noble White had obtained financing from GSB to produce that year's crops and had given GSB a security interest in the crops. GSB's security interest had been perfected by filing in both Union County and Johnson County. Noble White testified that on Friday, September 21, 1984, he had begun harvesting the crops from the property subject to the foreclosure proceeding and had completed harvesting between 80 and 100 acres of soybeans. Approximately 140 acres of soybeans remained to be harvested. He had been "rained out" on Saturday, September 22, and when he had returned to continue harvesting soybeans on Monday, September 24, he had been prevented from entering the property by a guard. Noble White testified that the Praters had no interest in the soybeans growing on the land, as he had rented the farm on a cash rent basis for the 1984 crop year.

On cross-examination Noble White stated that he had paid the Praters $15,000 of the cash rent and then had given them a note for

the balance of $45,000 by the middle of June when it was due. He stated that the $15,000 had been paid "in a series of checks" at "different times." Of the $20,000 that he had paid the Praters to date, approximately $8,000 had been paid to them directly in the form of checks or drafts, and he had also paid "light bills and phone bills." Noble White stated that on Friday, September 21, while he was harvesting the soybeans in question, his father-in-law, Gilbert Prater, had been present helping him fix his combine and had driven one of the combines part of the time. Upon further cross-examination Noble White acknowledged that the last three or four pages of the written farm lease, which contained descriptions of some of the property covered by the lease, were on legal-size paper that was longer than the first three or four pages. Noble White was not sure whether or not the legal-size pages were a part of the original lease, although "they could have been." The lease had not been recorded by Noble White either in Union County or Johnson County.

At the conclusion of the hearing, the trial court ruled that Noble White should be allowed to intervene as to the TRO of September 23, 1984, but "not as to the main case." The court additionally denied the motion of Noble White to dissolve the TRO as to him, finding:

"[t]here has been no showing *** that Mr. White, based upon what is before the court, has any right to those crops growing [sic]."

In colloquy following the court's ruling, counsel for Noble White observed that the issue as to ownership of the soybean crop had not been decided, with counsel for ANB adding that the question had "never been raised." The court responded:

"I am just saying that the bank is in possession of the property now. Mr. White, as an intervenor or agent or whatever[,] has no right to enter upon the land at this point in time."

The court's written order entered October 4, 1984, reiterated its finding that:

"Noble White has neither by his pleadings nor evidence adduced set forth any basis for dissolution of the restraining order or any basis for any right to any crops growing upon or severed from, after September 17, 1984, the mortgaged premises[.]"

On October 9, 1984, the trial court entered summary judgment for foreclosure of the mortgages of ANB and for sale of the mortgaged premises. Sale was held in November 1984 and confirmed in December 1984. On February 19, 1985, ANB filed a supplemental complaint in the foreclosure proceeding against supplemental defendants Prat-

ers, Noble White, and GSB. In its supplemental complaint, ANB alleged that subsequent to the court's order of September 17, 1984, placing ANB in possession of the mortgaged premises, the Praters and Noble White had severed approximately 1,441 bushels of soybeans from the property, which were delivered to B&K for a market price of $8,474.89. ANB had later severed an additional 845.48 bushels of soybeans from the property, which were delivered to B&K for a market price of $4,903.57. ANB stated that the trial court had found in its order denying Noble White's motion to dissolve the TRO that White had no basis for any right to any crops growing upon or severed from the premises after September 17, 1984, and alleged that neither Noble White nor GSB had any right to the subject crop that was superior to its right as mortgagee-in-possession. ANB, therefore, sought a declaration that its right was paramount to that of the Praters, Noble White, and GSB and prayed that B&K be ordered to pay the crop proceeds of $13,378.46 to ANB.

GSB filed an answer to the supplemental complaint in which it alleged that it was entitled to all proceeds from sale of the crop in question by reason of its security interest under section 9—312(2) of the UCC. It further alleged that its security interest was not affected by the court's finding in denying White's motion to dissolve the TRO because it was not a party to the proceeding in which the finding was made. GSB additionally filed a counterclaim against ANB in which it alleged that Noble White had entered into a farm lease with the Praters, that Noble White had entered into a loan agreement with GSB in which he had granted GSB an interest in certain crops as collateral, and that GSB had recorded its interest in such crops in Union County on April 9, 1984. Attached to GSB's counterclaim were copies of the written farm lease of May 10, 1984, between Noble White and the Praters, the loan agreement between Noble White and GSB granting GSB a security interest in certain crops located in Union County, and a UCC 1 financing statement covering crops in Union County that bore a filing date of April 11, 1984.

Noble White likewise filed an answer to ANB's supplemental complaint in which he asserted that the crop of soybeans growing on the mortgaged premises was the exclusive property of White, who had rented the ground and prepaid cash rent to the Praters. He acknowledged that he had harvested soybeans from the property on the dates alleged and asserted that Gilbert Prater was "an employee" or "volunteer" of Noble White. Noble White further filed a counterclaim in which he acknowledged the interest of GSB in the crop proceeds and requested that the court declare GSB entitled to all proceeds held by

B&K.

ANB subsequently filed a motion for summary judgment on its supplemental complaint. GSB likewise filed a motion for summary judgment in its favor. In support of its motion, GSB filed an affidavit by Noble White stating that White and GSB had entered into a loan agreement on April 5, 1984, to enable White to produce crops on the Praters' property, that pursuant to the agreement GSB had advanced White $100,933.33 in three installments on April 5, 1984, May 29, 1984, and June 26, 1984, and that White had in fact used all of these monies to produce crops on the Praters' property. White further stated that he and the Praters had entered into a lease covering the property subject to the ANB mortgages, that he had produced crops on this property and had delivered them to B&K, and that all of the monies held by B&K were from sale of crops from the property subject to the mortgages.

Following hearing on these motions the trial court, on November 12, 1984, entered summary judgment for ANB on its supplemental complaint, finding that as mortgagee-in-possession of the mortgaged premises, ANB's claim to the rents, issues, and profits of the property was prior and paramount to that of supplemental defendants Praters, Noble White, and GSB. The court ordered that proceeds of the soybean crop in question be paid to ANB and that the supplemental defendants be enjoined from further obstructing or interfering with ANB's rights as mortgagee-in-possession of the foreclosed property.

On appeal from this judgment, supplemental defendants Noble White and GSB contend initially that the trial court's order placing ANB in possession of the mortgaged premises was not effective as to them because they were not joined as parties to the main proceeding and had no opportunity to litigate the issue of their rights to the soybean crop in question. They assert, therefore, that to the extent that the trial court's summary judgment for ANB was based upon its findings in that main proceeding, it constituted error and must be reversed. ANB counters, however, that Noble White and GSB were bound by the trial court's finding in the main proceeding that Noble White had no basis for any right to crops growing on the mortgaged premises. ANB asserts that Noble White cannot now attack the court's order in the main proceeding placing ANB in possession of the premises since he was allowed to intervene as to that proceeding and failed to appeal from the court's order denying his motion to dissolve the TRO or the order placing the mortgagee in possession upon which the TRO was based.

We find no merit in the argument of ANB that Noble White and GSB were bound by the court's finding in the TRO proceeding that Noble White had no rights in the soybean crop. While Noble White sought and was allowed to intervene as to the TRO, which barred him from entering upon the premises to harvest the soybean crop, he was not a party to the proceeding in which the order of possession was entered and could not have appealed from that order. The court's denial of Noble White's motion to dissolve the TRO was premised on the order of possession and did not purport to determine the relative rights of claimants to the crop in question. The court determined merely that Noble White had no right to enter the property to harvest the soybean crop. To the extent that the court's denial of the motion to dissolve the TRO involved a finding regarding the ultimate ownership of the crop, the court's order went beyond what was to be decided in the TRO proceeding and cannot be said to be binding upon either Noble White or GSB.

It is settled that estoppel by verdict or collateral estoppel does not depend on technicalities but on broad principles of justice, and it can apply only when a party has had his day in court and an opportunity to establish his claim. (23A Ill. L. & Prac. *Judgments* sec. 361, at 141 (1979); *Smith v. Bishop* (1962), 26 Ill. 2d 434, 187 N.E.2d 217.) Supplemental defendants Noble White and GSB had no opportunity to litigate the issue of their rights to the soybean crop where they were not joined as defendants in the main proceeding, and they cannot be said to have had their day in court as to that issue. (*Cf. Lady v. Montgomery Ward & Co.* (1980), 80 Ill. App. 3d 69, 399 N.E.2d 346 (tenant joined as defendant in foreclosure action precluded from collateral attack of foreclosure decree, which determined its rights under lease, where tenant failed to appeal directly from that decree).) We, therefore, find that Noble White and GSB were not bound by any determination in the main proceeding of their rights to the soybean crop, and we reject ANB's contention to that effect.

ANB asserts that regardless of whether supplemental defendants Noble White and GSB were bound by the court's finding in the main proceeding, their right to the crop in question was effectively determined by the trial court in entering summary judgment for ANB on the supplemental complaint. ANB maintains that once it was placed in possession of the mortgaged premises upon default by the mortgagors, it was entitled by the terms of its mortgages to the rents and profits, including crops, of the property covered by the mortgages. This right of ANB as mortgagee-in-possession, it contends, was superior to that of the tenant, Noble White, who had leased the property

subject to the mortgages and who could acquire no greater right in the property than that possessed by the mortgagors, and to that of GSB whose claim to the soybean crop derived from Noble White.

Notwithstanding the merits of ANB's claim under pre-UCC law, GSB asserts that it had a superior right to the soybean crop under section 9—312(2) of the UCC, which gives priority to a perfected security interest in crops based on a current production loan over an earlier perfected security interest in the crops that secured obligations due more than six months before the crops became growing crops. Section 9—312(2) (Ill. Rev. Stat. 1983, ch. 26, par. 9—312(2)) provides:

> "(2) A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops become growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest."

GSB states that the record showed that the mortgages of ANB secured obligations that became due more than six months before Noble White planted crops on the mortgaged premises pursuant to the lease of May 10, 1984, and that its security interest in Noble White's crops was for new value given to enable White to produce crops during the 1984 production season and given not more than three months before the crops were planted. Thus, GSB maintains, it was entitled under section 9—312(2) to priority over the competing interest of ANB based on the "rents and profits" clause of its mortgages.

Whether section 9—312(2) is applicable to give priority to the security interest of GSB in the soybean crop planted by Noble White depends, in the first instance, upon whether ANB's claim to crops under the "rents and profits" clause of its real estate mortgages can be regarded as a security interest, as section 9—312(2) by its terms applies only in the case of conflicting *security interests* in crops. Article 9 of the UCC is expressly limited to secured transactions involving personal property (see Ill. Rev. Stat. 1983, ch. 26, par. 9—102) and does not apply to transactions involving interests in real estate (Ill. Rev. Stat. 1983, ch. 26, 9—104(j)).

The issue of whether a real estate mortgagee's interest in crops under a "rents and profits" clause contained in its mortgage constitutes a security interest subject to the provisions of the UCC appears to be one of first impression in Illinois. In *In re Application of North-*

*western Mutual Life Insurance Co.* (Colo. Ct. App. 1985), 703 P.2d 1314, 1317, the Colorado Court of Appeals stated, without discussion, that "the provisions of Article 9 of the Uniform Commercial Code (UCC) do not apply to a 'rents and profits' clause incident to a lien on real estate, be it a lease, mortgage, or deed of trust," citing section 9—104(j) of the UCC. Section 9—104(j) specifically excludes from application of article 9 of the UCC:

> "(j) *** the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder[.]" (Ill. Rev. Stat. 1983, ch. 26, par. 9—104(j).)

*Cf. In re: Royer's Bakery, Inc., Bankrupt* (E.D. Pa. 1963), 55 Berks County L.J. 164 (clause of real estate mortgage extending coverage of mortgage to things used in operation of business on mortgaged premises was not security interest within Code (UCC) because it related to real estate mortgage expressly excluded from Code, and mortgage was not brought within Code merely because it contained provisions relating to attached personal property).

In their treatise on the UCC, Professors White and Summers consider whether a real estate mortgagee's right to crops growing on mortgaged property pursuant to a clause in the mortgage claiming rents and profits could be said to be a security interest under the UCC. They observe:

> "Nothing in the definition of security interest in [section] 1—201(37) prevents such a real estate mortgagee's claims from being classified as a security interest, but nothing in [section] 1—201(37) intimates that the drafters intended such an interest to be regarded as a security interest." (J. White and R. Summers, Uniform Commercial Code sec. 25—6, at 1053 (2d ed. 1980).)

Professors White and Summers express no opinion as to whether the real estate mortgagee's right would be properly classified as a security interest under the UCC, but conclude:

> "Doubtless courts in states like Iowa which regarded such interests under the pre-Code law as chattel mortgages will now regard such interests as security interests governed by Article Nine. In such states crop lenders will be obliged to obtain subordination agreements from prior mortgagees and landlords in order to be assured of priority [in fact situations where section 9—312(2) is not applicable.] In other states which classify land mortgagees' claims against crops as something other than security interests, presumably priority disputes will be governed by non-Article Nine law, and the pre-existing common law rules will govern." J. White and R. Summers, Uniform Commercial

Code sec. 25—6, at 1053 (2d ed. 1980); see also 2 G. Gilmore, Security Interests in Personal Property sec. 32.5, at 865 (1965).

 A consideration of the nature of a mortgagee's right to crops as rents and profits of mortgaged property under Illinois law leads us to conclude that this right constitutes, not a personal property interest subject to the UCC, but an interest that derives from and is incident to the mortgagee's right to the real estate and that is thus governed by non-UCC law. Under well-established Illinois law, a clause in a real estate mortgage pledging rents and profits creates an equitable lien upon such rents and profits of the land, which may be enforced by the mortgagee upon default by taking possession of the mortgaged property. (*In re Bunting* (E.D. Ill. 1932), 60 F.2d 605; *Stevens v. Blue* (1944), 388 Ill. 92, 57 N.E.2d 451; *Liss v. Harris* (1940), 304 Ill. App. 173, 26 N.E.2d 133; see 27 Ill. L. & Prac. *Mortgages* secs. 116, 117 (1956).) Since, under Illinois law, unsevered crops growing upon the mortgaged premises are deemed to be part of the realty (*In re Bunting* (E.D. Ill. 1932), 60 F.2d 605; *John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315), the mortgagee is entitled to such crops upon taking possession of the premises. Until the mortgagee takes possession, however, the mortgagor is entitled to the growing crops, and if the crops are severed from the land prior to the mortgagee's taking possession, the mortgagor has an absolute right to them without liability to account to the mortgagee. (27 Ill. L. & Prac. *Mortgages* sec. 116, at 200 (1956); see *Dillon v. Dyer* (1930), 258 Ill. App. 144; *Taylor v. Osman* (1926), 239 Ill. App. 569.) Thus, while a "rents and profits" clause creates a lien upon the crops to provide security for the mortgagee in the event of a deficiency, this right derives from the real estate mortgage itself and does not depend upon compliance with chattel mortgage statutes (now the UCC). (See *In re Bunting* (E.D. Ill. 1932), 60 F.2d 605; *Liss v. Harris* (1940), 304 Ill. App. 173, 26 N.E.2d 133.) Because, under Illinois law, a "rents and profits" clause in a real estate mortgage conveys no separate right to the crops growing on the land, as would a chattel mortgage or article 9 security agreement, and because the real estate mortgagee's right to such rents and profits arises only as an incident of foreclosure of the real estate involved, we find that such a clause does not create a security interest in personal property so as to be subject to the provisions of the UCC.

In its argument on appeal GSB asserts that since, under the UCC, growing crops are classified as "goods" in which an article 9 security interest can be given (see Ill. Rev. Stat. 1983, ch. 26, pars. 9—105(h), 9—203(1)(a)), the mortgagee's right to such crops under a "rents and

profits" clause of a real estate mortgage must be considered a security interest for purposes of section 9—312(2). We find no merit in this argument because, as discussed above, the mortgagee's right to growing crops upon foreclosure of its real estate mortgage is different in character and derivation from an article 9 security interest in growing crops. There is no question that growing crops may be the subject of an article 9 security interest before they have been severed from the land. Indeed, ANB, the mortgagee here, could have chosen to secure its loan to the Praters with an article 9 security interest on crops "growing or to be grown" on the mortgaged property in addition to a mortgage on the real estate itself. Since ANB had no such security interest, ANB could claim the crops on the mortgaged premises only by foreclosing on its real estate mortgages and taking possession of the property before the crops were severed from the real estate. Thus, ANB's interest in the crops was not an article 9 security interest and should not be so considered.

GSB argues finally that a holding that no security interest is created by a "rents and profits" clause of a real estate mortgage would defeat the purpose of section 9—312(2), which is to grant priority to lenders who advance funds for the current year's production so as to promote cultivation of farmland that might otherwise become idle. GSB asserts that the lender who advances new funds to produce crops is entitled to rely on the security for which the loan was granted and should prevail over a lender who advanced nothing to produce the crops. Section 9—312(2), however, was not meant to grant a current year crop lender priority over all competing interests in the crops. For instance, the priority granted by section 9—312(2) may conflict, in the case of a tenant farmer, with the statutory lien on crops in favor of a landlord. (See Ill. Ann. Stat., ch. 26, par. 9—312(2), Illinois Code Comment, at 216 (Smith-Hurd 1974).) Such a statutory lien is specifically excluded from application of the UCC, as are real estate interests. (See Ill. Rev. Stat. 1983, ch. 26, par. 9—104(b); *McGahey v. Fuller* (1985), 131 Ill. App. 3d 663, 476 N.E.2d 438; *Dwyer v. Cooksville Grain Co.* (1983), 117 Ill. App. 3d 1001, 454 N.E.2d 357.) As the authors of the Illinois Code Comment to section 9—312(2) observe, a practical solution to such a possible conflict "may be found in a subordination agreement under sec. 9—316." (Ill. Ann. Stat., ch. 26, par. 9—312(2), Illinois Code Comment, at 216 (Smith-Hurd 1974).) Similarly, a current year crop lender who wished to protect its interest in the crops for which its loan was given could obtain a subordination agreement from a prior real estate mortgagee with a potential claim to the crops under a "rents and profits" clause of its

mortgage. As observed by Professor Gilmore in his treatise on security interests, this need to procure subordination agreements "[should do] no violence to established patterns in agricultural finance;" (2 G. Gilmore, Security Interests in Personal Property sec. 32.5, at 870 (1965)), as prudent practice would cause a subsequent lender to inquire into the debtor's equity position and attempt to obtain subordination of possible conflicting interests in its collateral.

■■ Despite GSB's assertions regarding the purpose of section 9—312(2), we do not believe that section 9—312(2) was intended to apply to a real estate mortgagee's right to rents and profits upon foreclosure so as to defeat remedies that mortgagee banks legitimately contract for and rely upon in originally providing funds to borrowers. The position argued for by GSB would serve to engraft section 9—312(2) of the UCC onto real property and mortgage law in such a way as to render meaningless long-standing rules regarding the right of a mortgagee-in-possession to rents and profits. (*Cf.* Ill. Rev. Stat. 1983, ch. 110, par. 15—310 (mortgagee-in-possession has right to receive rents, issues, and profits of mortgaged premises as conferred by terms of mortgage as well as other rights and privileges of mortgagee-in-possession under law).) Section 9—312(2), by its terms, governs competing security interests among crop lenders and applies only when the earlier security interest secures obligations due more than six months before the current year's crops are planted. The rationale for this provision, then, is to allow a current year crop lender priority over a crop lender who advanced money for production of crops in a previous year but who failed to obtain payment from the proceeds of the previous year's crops. While the priority given a current year crop lender under section 9—312(2) may be justified in the case of such a secured lender who had the opportunity to obtain payment from the previous year's crops, it has no application in the case of a real estate mortgagee who had no right to crops as collateral for its loan until it proceeded to foreclose its mortgage and take possession of the mortgaged property. We hold, therefore, that section 9—312(2) was neither designed nor intended to give a current year crop lender priority over a real estate mortgagee's right to the rents and profits of mortgaged property upon taking possession during foreclosure, and we reject GSB's contention to that effect.

Since the UCC does not apply to determine the priority of the conflicting claims of ANB and GSB to the soybean crop grown by Noble White on the mortgaged property, this determination must be made on the basis of preexisting common law rules governing such priority disputes. (See J. White and R. Summers, Uniform Commer-

cial Code sec. 25—6, at 1053 (2d ed. 1980).) As discussed above, it is settled under Illinois law that a real estate mortgagee who takes possession of mortgaged premises upon foreclosure is entitled to unsevered crops growing upon the property pursuant to a "rents and profits" clause of its mortgage. This right is derived from the mortgage itself, and its priority is determined from the time the mortgage was entered into. (See *In re Bunting* (E.D. Ill. 1932), 60 F.2d 605; *Stevens v. Blue* (1944), 388 Ill. 92, 57 N.E.2d 451; *John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315; *cf. In re Application of Northwest Mutual Life Insurance Co.* (Colo. Ct. App. 1985), 703 P.2d 1314 (under Colorado law, priority of mortgagee's right under "rents and profits" clause of trust deed determined by the time of application for receivership).) Under Illinois law, moreover, the giving of a chattel mortgage (now a security interest under the UCC) upon growing crops does not constitute a severance of the crops from the real estate (*John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315; *cf. In re Application of Northwest Mutual Life Insurance Co.* (Colo. Ct. App. 1985), 703 P.2d 1314 (under Colorado law, security interest in crops constitutes severance from property)), and a mortgagor cannot defeat the real estate mortgagee's right to such crops as rents and profits of the mortgaged property by "selling [them], without cutting, before the foreclosure, nor by giving a chattel mortgage on [the crops]" (*John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315, 319; see *In re Bunting* (E.D. Ill. 1932), 60 F.2d 605).

Applying these rules in the instant case, ANB's right under the "rents and profits" clause of its mortgages would be prior to and thus superior to GSB's right under its article 9 security interest in the crops growing on the mortgaged premises. Since, at the time ANB was placed in possession of the premises by order of the court on September 17, 1984, there had been no severance of the soybean crop in question, ANB could claim the crop as rents and profits of the land subject to its mortgages. See *Rankin-Whitham State Bank v. Mulcahey* (1931), 344 Ill. 99, 176 N.E. 366; *Rohrer v. Deatherage* (1929), 336 Ill. 450, 168 N.E 266; *John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315 (mortgagee entitled, upon appointment of receiver, to unsevered crops growing on mortgaged premises); see also Ill. Rev. Stat. 1983, ch. 110, pars. 15—308, 15—310; *cf. Taylor v. Osman* (1926), 239 Ill. App. 569 (mortgagee had no right to crop that was severed from land before receiver appointed).

GSB and Noble White assert, however, that, even assuming the priority of ANB's right to rents and profits of the land upon taking

possession of the mortgaged premises, in the instant case, where the property had been leased to Noble White for farming purposes, ANB was entitled only to those rents accruing to the Praters as landlords under the lease and only to those rents accruing after ANB had taken possession. Since Noble White had leased the property on a cash-rent basis and had paid the rent in advance prior to the time that ANB had acquired possession of the mortgaged premises, the appellants maintain that ANB was entitled to no part of the soybean crop in question, which belonged to tenant Noble White under the provisions of the lease.

As the appellants suggest, the trial court's judgment awarding the entire soybean crop to ANB as rents and profits of the land seems to have been founded upon an assumption that no lease existed between the Praters and Noble White so that ANB, as mortgagee, was entitled to the mortgagors' interest in the entire crop. A different result would obtain, however, if Noble White had an interest in the crop as a tenant of the mortgagors Praters. A mortgagor in possession of mortgaged premises has the right to lease the premises and to collect any rents due under the lease prior to foreclosure and entry into possession by the mortgagee. (*Taylor v. Osman* (1926), 239 Ill. App. 569; 27 Ill. L. & Prac. *Mortgages* secs. 115, 117, 118 (1956); see *Rohrer v. Deatherage* (1929), 336 Ill. 450, 168 N.E. 266.) The mortgagee, upon taking possession pursuant to foreclosure, acquires only the interest of the mortgagor in the property (*John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315), and, where the mortgagor has leased the property to a tenant on a crop-share basis, the mortgagee-in-possession may claim only the landlord-mortgagor's share of the crops growing on the mortgaged property (see *Taylor v. Osman* (1926), 239 Ill. App. 569; *John Hancock Mutual Life Insurance Co. v. Watson* (1916), 200 Ill. App. 315).

We are unaware of a similar rule applicable to a situation such as the case at bar involving a cash-rent lease under which the rent was allegedly paid in advance before the mortgagee took possession and the tenant became entitled to the entire crop grown on the mortgaged property. Because of the wide variety of farm leases and the differing fact situations that may arise, depending upon the timing of a mortgage foreclosure and order of possession relative to the growing season of crops planted under such leases, it would be unwise to attempt to formulate a rule setting forth the specific rights of those claiming the crops in every such situation.

In the instant case, moreover, it is necessary first to determine, upon remand, whether a valid, arm's length lease existed be-

tween the Praters and Noble White and whether the terms of the alleged lease had been complied with so as to give Noble White a right to the soybean crop in question as a tenant under the lease. While ANB asserts on appeal that the lease was a sham and that Noble White had failed to pay the cash rent as required by its terms, the trial court failed to resolve this material question of fact. Summary judgment should be entered only when the pleadings and admissions, together with any affidavits, show that there is no genuine issue as to a material fact, and the mere filing of cross-motions for summary judgment as occurred here does not relieve the trial court of the obligation to make an independent determination as to the existence of such genuine issue of fact. (*Beverly Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 436 N.E.2d 598.) The validity and effect of the lease here affects not only the right of Noble White to the soybean crop but also the right of GSB, whose security interest in the crop depended upon Noble White's rights in the collateral. (See Ill. Rev. Stat. 1983, ch. 26, par. 9—203(c).) We, therefore, reverse the trial court's award of summary judgment in favor of ANB and remand this cause for further proceedings.

Reversed and remanded.

KARNS, P.J., and KASSERMAN, J., concur.