No. 79,191

MORITZ IMPLEMENT COMPANY, INC., *Appellee,* v. JOHN L. MATTHEWS, a/k/a JOHN MATTHEWS, *Appellant,* THE JAMESTOWN STATE BANK, *Defendant,* DAVID R. KLAASSEN, the successor in the interest of HAMPTON, ROYCE, ENGLEMAN & NELSON, L.C., *Appellant,* EMMETT GAYLORD ROTHCHILD and IVA MARIE ROTHCHILD, husband and wife, *Defendants,* JEROME L. BODEN and VELORA K. BODEN, husband and wife, *Defendants,* FARMWAY CREDIT UNION, *Appellant,* and THE BOARD OF COUNTY COMMISSIONERS OF JEWELL COUNTY, KANSAS, *Defendant.*

(959 P.2d 886)

Opinion filed May 29, 1998.

*David R. Klaassen,* of Marquette, argued the cause, and *Rod Ludwig,* of Miller & Ludwig, of Beloit, was with him on the briefs for appellants.

*Guy R. Steier,* of Frasier & Steier, of Beloit, argued the cause, and *Curtis A. Frasier,* of the same firm, was with him on the briefs for appellee.

*Charles N. Henson,* of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, was on the brief for *amicus curiae* Kansas Bankers Association.

The opinion of the court was delivered by

LARSON, J.: This case involves a first-impression issue of who is entitled to crops growing upon real property sold in a foreclosure sale. John Matthews and various of his creditors with perfected security interests in crops growing upon his land appeal the decision of the trial court holding title to the unharvested crops passed to the purchaser at the foreclosure sale, Moritz Implement Company, Inc. (Moritz). They also appeal the order of the trial court awarding Moritz attorney fees under the terms of a promissory note, as allowed by K.S.A. 58-2312.

*Factual statement*

The facts are undisputed. On July 6, 1995, Moritz filed a petition to foreclose its mortgages on real property owned by Matthews. The mortgages, which secured promissory notes totalling $43,860.87, were dated February 28, 1991, and August 26, 1994. The latter note contained the following language: "Upon default, Borrowers agree to pay all costs and expenses, including attorney fees and expenses, which may be incurred in the collection of this note or any part thereof." Moritz' petition requested attorney fees and costs, without specifying an amount.

Prior to the commencement of the foreclosure action, Farmway Credit Union (Farmway) and David R. Klaassen (Klaassen), the successor in interest to Hampton, Royce, Engleman & Nelson, L.C. (Hampton), obtained and perfected security interests in crops Matthews might grow on his property. In its foreclosure petition, Moritz did not state it was asserting a lien against crops growing on Matthews' real estate or that it considered any such crops subject to its mortgage interests. Neither did Moritz claim any interest in any growing crops under any provision in its mortgage purporting it covered "rents and profits."

The court entered judgment on the notes as prayed for in Moritz' foreclosure petition and entered an order of sale. Matthews filed an appeal, which was later dismissed by the Court of Appeals.

In the interim, on February 1, 1996, Matthews filed a voluntary petition for relief under Chapter 12 of the bankruptcy code. The bankruptcy court granted Matthews' motion to obtain a revolving

line of credit from Farmway to be secured by a priority lien in growing crops on Matthews' property. Moritz never objected to the motion. During August and September 1996, Matthews borrowed money from Farmway and planted 105 acres of wheat on the property which was subject to Moritz' foreclosure petition.

Matthews' bankruptcy case was dismissed on October 29, 1996. Shortly thereafter, the district court again entered an order of sale, in which the proceeds of the sale were to be paid and applied as follows:

"1. To the payment of the costs of this action and of said sale;

"2. To the payment of all real estate taxes and assessments that may be due upon said real estate;

"3. The payment of the first mortgage indebtedness due to The Jamestown State Bank;

"4. To the payment of the judgment due Plaintiff Moritz Implement Company, Inc.;

"5. To the payment of the mortgage indebtedness held by Hampton, Royce, Engleman & Nelson, L.C.;

"6. To the payment of the mortgage indebtedness held by Emmett Gaylord Rothchild and Iva Marie Rothchild;

"7. The surplus, if any, to be paid into the hand of the Clerk of this court to await further order of this Court."

The sale was subject to a 3-month redemption period and was set for December 16, 1996.

Prior to the sale, Matthews gave all parties notice of Farmway's and Klaassen's security interests in the wheat growing on the property. The purchase price at the foreclosure sale ($109,922.35) left an amount in excess of the total amount necessary to pay items 1 through 4 in the order for sale, and Klaassen was next in line to receive proceeds from the sale. Moritz moved to confirm the sale and for assessment of attorney fees and allocation of proceeds.

Matthews filed a response objecting to Moritz' motion for confirmation of the sale. Matthews requested the court, if it confirmed the sale, to hold that the crops growing upon the foreclosed property were personal property subject to duly perfected security interests and not part of the land sold at the foreclosure sale.

The court confirmed the sale, awarded Moritz attorney fees from the remaining sale proceeds, and held that the growing wheat crop

passed to the purchaser at the sale as part of the real estate, free of all security interests. In deciding that the security interests of Farmway and Klaassen did not attach to the crops on foreclosed real property, the court relied upon pre-Uniform Commercial Code (UCC) Kansas case law and determined that an Illinois case, *Anna National Bank v. Prater*, 154 Ill. App. 3d 6, 506 N.E.2d 769 (1987), supported its position that the UCC did not apply.

Farmway, Klaassen, and Matthews appeal. The case is before us pursuant to K.S.A. 20-3018(c).

*Entitlement to crops*

Moritz claims title to the crops planted on Matthews' property under a line of old cases whereby the purchaser at a foreclosure sale was entitled to growing, unsevered crops after the redemption period had expired. Moritz first cites *Beckman v. Sikes*, 35 Kan. 120, 10 Pac. 592 (1886), and states that this principle was upheld in *Goodwin v. Smith*, 49 Kan. 351, 31 Pac. 153 (1892), and *Brendle v. Hudson*, 146 Kan. 924, 73 P.2d 1013 (1937).

Despite the rule promulgated in these earlier cases, the question before us is whether the adoption of the UCC in Kansas, effective January 1, 1966, changed the law regarding interests in growing crops. This involves questions of law and statutory construction, over which we have unlimited review. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 643, 941 P.2d 1321 (1997).

K.S.A. 84-1-102 sets forth the purposes of the UCC and provides in part:

"(1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

"(2) Underlying purposes and policies of this act are:

(a) to simplify, clarify and modernize the law governing commercial transactions."

Article 9 of the UCC governs secured transactions. K.S.A. 84-9-102 defines the policy and subject matter of Article 9 and states:

"(1) Except as otherwise provided in section 84-9-104 on excluded transactions, this article applies

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts."

K.S.A. 84-9-104 states that Article 9 does not apply to the following relevant transactions:

"(j) except to the extent that provision is made for fixtures in section 84-9-313, to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder."

Pursuant to the above statutes, Article 9 clearly applies to any transaction which is intended to create a security interest in "goods," which is defined in K.S.A. 84-9-105(h):

" 'Goods' includes all things which are movable at the time the security interest attaches or which are fixtures (K.S.A. 84-9-313, and amendments thereto) . . . 'Goods' also include standing timber which is to be cut and removed under a conveyance or contract for sale, the unborn young of animals and *growing crops.*" (Emphasis added.)

Article 9 sets forth rules for creating and perfecting security interests in goods and other types of property and designates the relative priorities of those claiming interests in such property, including subsequent purchasers. K.S.A. 84-9-201 generally provides that a security agreement is effective as against the parties, purchasers of the collateral, and creditors. K.S.A. 84-9-301 and K.S.A. 84-9-312 designate the priorities involving perfected and unperfected security interests and indicate that all unperfected interests are subordinate to properly perfected security interests. K.S.A. 84-9-307 lists the limited circumstances in which buyers of goods may take free of a security interest.

With this general background of the UCC in mind, we analyze these statutory provisions under the facts herein. It is undisputed that Moritz has never claimed to have a perfected security interest in the growing crops. Any claim it has to the crops derives from its status as the purchaser of the real estate upon which the unsevered crops were growing at the time of the foreclosure sale.

The trial court rejected the arguments of Farmway and Klaassen that the crops growing on the land were personalty under the UCC so that their security interests remained attached when the land was sold in the foreclosure sale. The trial court relied upon *Anna National Bank v. Prater*, 154 Ill. App. 3d 6, to support its position that the UCC was not designed to give a current crop year lender

priority over a mortgagee in foreclosure or the purchaser at the foreclosure sale. The trial court cited *Capitol Fed'l Savings & Loan Ass'n v. Hoger*, 19 Kan. App. 2d 1052, 880 P.2d 281, *rev. denied* 256 Kan. 994 (1994) (which is clearly a fixture case and not applicable), to state the *Prater* rule was consistent with Kansas law. *Hoger* dealt with the remedies possessed by a secured creditor with a security interest in fixtures. Its result is more subject to analysis favorable to the position of Matthews, Farmway, and Klaassen, but it is best characterized as not being persuasive authority in this case.

It is clear, however, that the rule adopted by the trial court and advocated by Moritz is contrary to the UCC and unsupported by the authorities throughout the United States. The holding of *Prater* has been criticized and was quickly legislatively overruled in Illinois. See Meyer, *A Potpourri of Agricultural UCC Issues: Attachment, Real Estate-Growing Crops and Federalization*, 12 Hamline L. Rev. 741, 763 (1989).

Barkley Clark, in The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 8.05[1] (1993), remarks: "It is also clear that growing crops are treated as 'goods' under the UCC, and thus are subject to the rules of Article 9. . . . Unlike fixtures, where the UCC defers to state law for a definition, Article 9 sets its own standards for security interests in growing crops." Clark goes on to explain:

"Although interests in real estate are excluded from Article 9 by § 9-104(j), 'crops' are brought back within the scope of Article 9 by definition. Therefore, the real estate mortgagee should be considered unperfected as to the crops. In other words, Article 9 is the *exclusive* statutory scheme to cover security interests in growing crops, and the mortgagee should not be able to claim a security interest under real estate law. . . . If the real estate mortgagee wants to include crops, it does not seem too much to ask that it file a UCC financing statement and be subject to the priority rules of Article 9. Otherwise, there is a conflict between two different filing systems, with complete uncertainty regarding priority."

The Hamline Law Review article by Professor Meyer recognizes that prior to the adoption of the UCC, a purchaser of real property on which crops were growing took title to those crops, as they were considered part of the real estate. Meyer then discusses whether

such rules still applied in light of the UCC, and pointed out that the Eighth Circuit considered this issue in the context of a contract for deed case in which the seller repossessed the land in *United States v. Newcomb*, 682 F.2d 758 (8th Cir. 1982). *Newcomb* held that Article 9 applied and that growing crops were personalty, not realty, such that the seller's failure to comply with Article 9 resulted in his loss of any claimed interest in the crops to the secured party. See 12 Hamline L. Rev. at 751-52.

After discussing how *Newcomb's* analysis of growing crops as personalty was correctly applied, the article notes:

"[I]t seems clear that the drafters of the [UCC] and the legislatures that have adopted it intended growing crops to be considered personal property.

"Because security interests created in growing crops are governed by Article 9, the attachment, perfection, and priority rules apply to any party claiming an interest in crops, whether severed or not. As a result, any party claiming the unsevered crops as part of the real estate will have no possibility of defeating a properly perfected secured party unless the crops are specifically referred to in the real estate mortgage or installment contract *and* a proper Article 9 financing statement is properly filed. . . .

"A question concerning the applicability of Article 9 arises when a real estate mortgagee claims the crops upon default by the mortgagor. Inasmuch as this is very similar to a land contract, the analysis applied in *Newcomb* is applicable.

"Unlike the fixture financier who can perfect by complying with the real estate law, the real estate mortgagee . . . must comply with Article 9 to claim a security interest in growing crops, crops to be grown, or harvested crops." 12 Hamline L. Rev. at 752-53.

### Professor Meyer adds:

"When any conflicts as to priority claims in crops surface, Article 9 should control whether the crops represent rent, collateral for a loan, or are claimed under a real estate mortgage. The drafters of the UCC and legislatures in enacting Article 9 created a scheme with simple, understandable rules producing predictable results when issues concerning security interests in personal property arise. Thus, any conflict dealing with personal property should be governed by Article 9. Because all forms of crops, such as crops to be planted, growing crops, harvested crops, and stored crops, are personal property, Article 9 should control when the farmer defaults on any loan." 12 Hamline L. Rev. at 762.

Another law review article, Coogan & Mays, *Crop Financing and Article 9: A Dialogue With Particular Emphasis on the Problems of Florida Citrus Crop Financing*, 22 U. Miami L. Rev. 13, 30-32

(1967), contains a discussion of the security interest in crops. One of the authors, Coogan, states:

"I am presently of the opinion that the rights of those claiming a security interest in crops in any state are to be found primarily in article 9 in the form adopted by that state's legislature. The state's pre-Code law has a limited effect.

"Crops are one of five categories of property which have some characteristics of realty and some characteristics of personalty. Article 9, and the Code generally, does not treat each of these categories in the same way. I am presently of the opinion that, *so far as sales of,* and *security interests in, crops* are concerned the UCC controls.

. . . .

". . . Both Article 2 on sales and article 9 on secured transactions define 'goods' to include growing crops. Sales of goods are governed by article 2 and security interest in goods are governed by article 9. By these definitions the Code adopts the view towards which courts and legislatures have been moving for some time—sales of and security interests in growing crops are governed by personal property law. . . . For security purposes, crops are now goods, and for security purposes are governed only by the Code. Either the real estate mortgagee perfected his interest in crops under the UCC, or he has no more interest in crops than he has in other personal property. . . .

. . . .

". . . It is my present position that unlike the UCC's treatment of fixtures, where some part of pre-Code law is adopted, the UCC largely sets its own standards for crop security interests."

Another commentary, Note, *Agricultural Financing Under the UCC,* 12 Ariz. L. Rev. 391, 401 (1970), provides: "Likewise, under the Code a real estate mortgage encumbrancing only the land will not create a security interest in the crops growing or to be grown thereon because a mortgage on the land does not create a security interest in the personalty."

2 Gilmore, Security Interests in Personal Property § 32.4, p. 865 notes: "[I]t is clear that the crop interest covered by Article 9 is a personal property security interest; as to the crops, the real estate lessor, mortgagee or whatnot would have to file under Article 9." Henson, Secured Transactions Under the Uniform Commercial Code § 5-5, p. 84 (1973) states: "It would seem to be clear that a real estate mortgagee who intends to claim an interest in crops which has priority over subsequently granted security interests in

the crops as personalty will have to comply with the Article 9 requirements as to filing."

4 White & Summers, Uniform Commercial Code, § 30-7, pp. 44-45 (4th ed. 1995) reads:

"Crops are also close to realty, but according to sections 2-107 and 9-105(h), crops are goods. To create a security interest in crops the parties must comply with Article 9 rules on creation and perfection. Under a proper interpretation of Article 9, a real estate mortgagee cannot subject crops to his mortgage merely by complying with real estate mortgage law. Crops differ from fixtures in this respect."

In addition to *Newcomb*, 682 F.2d 758, discussed above, Matthews and his secured creditors, as well as the *amicus curiae*, the Kansas Bankers Association, cite numerous bankruptcy cases to support their position that growing crops are personalty to which a security interest remains attached. While not directly on point, several provide helpful analysis of the legal issue we face.

In *In re Hill*, 83 Bankr. 522, 527-28 (Bankr. E.D. Tenn. 1988), the bankruptcy court was called upon to determine who was entitled to nursery plants growing on mortgaged land. The court first noted that because Article 9 recognizes that competing claims to fixtures can arise under both it and real property law, Article 9 provides rules on determining the priority of claims when there is a conflict with other law. The court then pointed out that Article 9 does not contain any provision dealing with such a conflict pertaining to crops, suggesting that Article 9 does not permit a mortgage on land to create any type of lien unless UCC requirements are followed.

The *Hill* court went on to state that although real property law could make a mortgage apply between the parties to the mortgage, this does not mean such law must determine priority between the mortgagee and third-party creditors. The court set forth a hypothetical very similar to the facts of the case before us, noting the complicated legal issues that could be involved. The court then held:

"In light of the problems that might arise, the court believes that Article 9 of the UCC should determine priority. Since the adoption of Article 9, a creditor who takes a security interest in crops should be able to determine and control the

priority of the security interest against other contractual liens and against judgment liens by checking the UCC filings and by filing a financing statement. The creditor should not have to check the real estate records. Article 9 attempted to modernize and simplify the law of secured transactions in personal property. This purpose should not be undercut by adopting a set of conflicting priority rules for a crop lien that is created by a contract, a mortgage on land, as a matter of law rather than by express agreement in the contract. The present system of crop financing and farm lending with crops as collateral would be unduly upset if the court allowed recorded mortgages on farm land to have a supervening non-Article 9 priority over perfected security interests in crops." 83 Bankr. at 529.

In *In re Hoover,* 31 Bankr. 432 (Bankr. S.D. Ohio 1983), the court determined that because a wheat crop was personalty, not realty, the crop did not revert to a lessor after the debtor's lease expired so as to subvert the interest of perfected secured creditors of the debtor. Citing *Newcomb,* 682 F.2d 758, the court noted:

"Although there is surprisingly little authority on the issue of the rights of a secured party with a security interest in a crop to that crop when the ground upon which the crop is growing reverts to one other than the debtor, it appears that such a creditor retains his security interest in the crop." 31 Bankr. at 436.

Although Article 9 may not control every possible interest in crops, there is no justification for holding that a real estate grantee, such as a purchaser at a foreclosure sale, should be able to avoid a properly perfected security interest in crops, particularly where the grantee has received actual notice of the security interest. This statement is supported by the provision in K.S.A. 84-2-107(3) whereby a contract for the sale of crops may be executed and recorded in order to provide notice to third parties of the buyer's rights under the contract. We do not, however, decide this case on a notice analysis because of the clear application of UCC Article 9 provisions.

In light of the above commentary and analysis, we hold the perfected security interests of Farmway and Klaassen remained attached to the crops despite the transfer of the property in the foreclosure sale. This holding supports the intent and purposes of the UCC in that creditors may rely upon clear rules for protecting their security interests, rather than worrying about the uncertain applicability of archaic pre-UCC real estate law. If we were to adopt Moritz' position, the ability to secure crop financing would

be seriously impaired as creditors would be forced to gamble upon the timing of foreclosure proceedings and even the weather in a race to sever crops before a redemption period expires after an order for sale. Such a rule is not consistent with the stated purposes of the UCC or with any existing case law in the country. In addition, our holding will continue to protect and make available to agricultural interests a vital and necessary method of growing crop financing.

The remaining issues raised by the parties and *amicus curiae* pertaining to waiver and estoppel, collateral estoppel, and the validity of bankruptcy priorities need not be addressed in light of our foregoing conclusion.

Moritz also attempts to assert that the validity of Klaassen's and Farmway's security interests in the crops has never been established. This argument, however, ignores that Moritz never claimed an interest in the crops in its foreclosure petition such that the validity of the security interests would be placed in issue. This is not an issue we are required to answer.

## Attorney fees

Matthews, Farmway, and Klaassen argue that because an award of attorney fees was not specifically mentioned in the judgment on Moritz' foreclosure petition and no amount was specified, the court could not award attorney fees in the confirmation of sale. Claiming that the order for attorney fees equates to an order for execution of a judgment which was not final, in violation of K.S.A. 60-262(a), they assert that only the amount specifically set forth in the judgment could be awarded pursuant to the order of sale. No precedent is cited for this proposition. Matthews and his creditors further contend that the doctrine of merger caused all of Moritz' rights and remedies to merge into Moritz' judgment on its foreclosure petition, such that its claim to attorney fees was extinguished.

Moritz cites *Snodgrass v. State Farm Mut. Auto Ins. Co.*, 246 Kan. 371, 789 P.2d 211 (1990), pertaining to appellate jurisdiction, to argue that a judgment is valid even though it reserves determination of attorney fees for a later date. *Snodgrass* held that a judgment may be considered final for purposes of an appeal despite the fact that a question regarding attorney fees remains to be decided.

A similar rationale should be applied in the present case. Although the judgment granting the right to foreclose on Matthews' property did not specifically set forth an amount due for attorney fees, this does not prevent the parties from adjudicating the amount to be awarded for attorney fees at the time when the fees can be properly and finally assessed. It might have been better procedure to so state in the journal entry of judgment, but we do not hold the failure to do so, as occurred in this case, precludes the allowance of attorney fees.

Furthermore, it is difficult to see how the doctrine of merger applies so as to extinguish Moritz' claim to attorney fees, as the foreclosure order did grant Moritz judgment on the notes as prayed for in its petition. This would appear to incorporate Moritz' claim for attorney fees in the judgment, not extinguish it.

Although Kansas has not historically allowed attorney fees in instances such as here exist, the 1994 legislature specifically amended K.S.A. 58-2312 (Ensley) to allow any note to provide for attorney fees when it stated:

*"Except as otherwise provided by law, any note, mortgage or other credit agreement may provide for the payment of reasonable costs of collection, including, but not limited to, court costs, attorney fees and collection agency fees, except that such costs of collection: (1) May not include costs that were incurred by a salaried employee of the creditor or its assignee; and (2) may not include the recovery of both attorney fees and collection agency fees."* L. 1994, ch. 276, § 3.

This provision became effective July 1, 1994, which was prior to Matthews' execution of the note providing for attorney fees on August 26, 1994.

The trial court properly allowed attorney fees to Moritz.

The judgment of the trial court as to the ownership of the growing crops at the time of the foreclosure sale is reversed. The wheat crop is held to be personal property subject to duly perfected security interests and not part of the land sold at the foreclosure sale.

The judgment of the trial court awarding attorney fees to Moritz is affirmed.

Affirmed in part and reversed in part.