**In re VERNON–LINDEN ASSOCIATES, an Illinois Limited Partnership, Debtor.**

No. 88–80741.

United States Bankruptcy Court, C.D. Illinois.

Aug. 27, 1990.

Gary T. Rafool, Peoria, Ill., for debtor.

Alan L. Sternberg, Bloomington, Ill., for BancWest of McLean County.

Stephen A. Kouri, Peoria, Ill., for Wright.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The Debtor is an Illinois Limited Partnership which owned and operated an apartment complex in Bloomington, Illinois. The Debtor had obtained the apartment complex pursuant to an Agreement for Warranty Deed entered into with several individuals (Contract Sellers). Prior to the Contract Sellers transferring ownership to the Debtor, they had mortgaged the apartment complex and had incurred personal liability to the mortgagees. When the Agreement for Warranty Deed was entered into, their personal liability continued. Subsequently the Debtor filed a Chapter 11 proceeding in the Bankruptcy Court for the Northern District of Texas which was transferred to this Court. Once transferred to this Court, the Debtor filed a motion to sell the apartment complex, and this Court entered an order authorizing the sale to one Steven D. Milner. That sale could not be completed, and the Debtor

filed a second amended liquidating plan of reorganization, which proposed to

> [I]mmediately place said apartment complex on the real estate market again in the hope that a sale can be consummated under at least the same terms as those heretofore approved by this Court; or, on such lesser terms as shall hereafter be approved by this Court.

At the confirmation hearing, the Debtor indicated its plan was to sell the apartment complex on the open market within ninety days of confirmation, and if not sold within that period it would seek further relief from this Court. At the confirmation hearing, the Contract Sellers indicated they had no objection to a sale, but requested that the apartment complex be listed with a Bloomington–Normal real estate broker. The Debtor had no objection to this request. An order was entered confirming the Second Amended Plan of Reorganization. The Order authorized a sale of the apartment complex and provided in part as follows:

> That Debtor shall immediately list said apartment complex for sale with a realtor in the Bloomington–Normal, Illinois area who shall have the means to reasonably market said apartment complex during said 90 day period, or such extended periods as shall be allowed, and the name of said realtor shall be furnished this Court by Debtor immediately after the effective date of this Order, with copies of said notification to the United States Trustee, Bruce Brennan, as Attorney for Debtor's Contract Sellers, and to Clay Cox, as Attorney for certain of Debtor's Limited Partners.
>
> That any proposals to purchase of said apartment complex shall be subject to approval of this Court after Notice and Hearing thereon, and Debtor shall immediately submit any such proposals received to this Court together with its recommendation thereto.

On May 1, 1989, the Debtor and William Wright (WRIGHT) entered into a Uniform Listing Contract which gave WRIGHT the "exclusive right" until August 1, 1989, to sell the apartment complex for a gross price of $2,000,000.00. A standard form of listing contract was used, which provided, in part, as follows:

> If any sale ~~or exchange~~ is made by you, the owner, ~~or anyone else~~ during this period, the owner will pay a commission of __4%__ of the purchase price which shall be computed upon the full gross consideration. If the owner accepts any real estate or any other property for part or all of the consideration, then the owner shall pay the commission upon the full gross consideration.
>
> Such compensation shall be paid if property is sold, ~~conveyed or otherwise transferred~~ within __0__ days after the termination of this authority or any extension thereof to anyone with whom agent or his subagent has had negotiations prior to final termination, before or upon termination of this agreement or any extension thereof. However, I shall not be obligated to pay such compensation if a valid listing agreement is entered into during the term of said protection period with another licensed real estate broker and a sale, lease, or exchange of the property is made during the term of said protection period.
>
> The commission shall be earned upon execution by a purchaser of a contract to purchase containing the listed price as the offering price or upon execution by the seller of a contract to purchase containing a different price agreed to by the seller. The commission shall be payable upon any of the following occasions: a. Upon closing of the sale; [1]

The following additional provision was added to the standard form:

> Any sale hereunder shall be subject to the approval of the Bankruptcy Court, and in the event Bankruptcy Court approval for a sale to Purchaser hereunder is not obtained by Seller, then no commission shall be due or payable to you. Subject to formal contract of sale to be negotiated between Purchaser and Seller.

---

1. Certain of the standard provisions were deleted by the parties through delineation.

The Court was not advised that WRIGHT was the realtor. Nor was WRIGHT's employment authorized pursuant to Section 327 of the Bankruptcy Code, 11 U.S.C. Section 327, and Rule 2014 of the Bankruptcy Rules.

On June 21, 1989, the Contract Sellers filed a Motion to Sell the apartment complex, alleging that the Debtor had not been successful in its attempt, that the apartment complex was not receiving adequate maintenance and was deteriorating, that its fair market value was decreasing, and that the Contract Sellers had found a buyer for $1,560,000.00.

On June 23, 1989, the Debtor filed a motion for the Court to sell the apartment complex, alleging that the Debtor had received four proposals, and/or inquiries, as follows:

A. Proposal submitted by Jeff M. Tinervin, as Agent for Buyer, which Proposal was submitted by Bruce A. Brennan, as one of the contract sellers of Vernon–Linden Associates, said proposal is dated June 7, 1989, and it is to purchase all of said real estate for $1,560,000.00 and it was received on or about June 22, 1989, said offer appears to be a conditional cash offer;

B. Proposal by Michael Sauvageau, President of Quality Student Rentals, Inc., dated June 19, 1989, to purchase all of said real estate for $1,900,000.00, said offer appears to be in the nature of an option and/or agreement to purchase on or before December 31, 1989; said proposal could subject the estate to a real estate commission of approximately $35,000.00 from the payment of said purchase price;

C. Proposal by George Callantine and Associates, dated May 30, 1989, to purchase said real estate for $1,200,-000.00, with any equity therein to be paid in cash and assumptions of the existing mortgages;

D. Proposal by David L. Lucher and William Shewman dated May 24, 1989, to purchase all of said real estate for $1,595,000.00, for cash on or before July 28, 1989, upon all conditions thereof being met.

The Debtor's motion went on to allege:

8. That because of the variance in said proposals, plus the possibilities of some or all of said proposals being increased at a Court conducted sale, it is, in Debtor's opinion, impossible for it to make a recommendation as to which of said proposals would be beneficial to its Chapter 11 estate.

9. That it would be in the best interests of this estate and all interested parties if this Court, after notice to each of said potential purchasers, and all interested parties, conduct a sale of said real estate pursuant to Sections 363(b), (c), and (f), free and clear of all liens and interests, with any such liens and/or interests to attach to the proceeds of said sale in order of their priority thereto.

The Debtor's motion requested

[T]his Court send Notice of any hearing on this Motion to each of said proposers to purchase and all interested parties herein, that said Motion be allowed, that this Court conduct said sale as soon as possible, and the [sic] it have such other and further relief as is just.

The Court held an extensive hearing on both motions to sell. Attending the hearing were attorneys for the Debtor, various secured creditors, and the Contract Sellers, along with various potential buyers and/or their real estate agents, including WRIGHT who represented three of the four potential buyers. During the hearing, no mention was made of WRIGHT's exclusive listing contract, although the Debtor's attorney did in general state that a sales commission would have to be paid, depending upon which buyer was successful, and when discussing the Contract Sellers' motion stated that the $90,000.00 commission associated with that proposal would probably have to be shared. Up to this point, no one, including WRIGHT, suggested that because of the uniform listing contract, either that a sale could not go forward or that WRIGHT had a claim to commissions.

After conducting the hearing, the Court went off the record and gave the interested

parties an opportunity to discuss the various proposals. When the Court went back on the record, it approved the Contract Sellers' motion and authorized the sale of the apartment complex free and clear of liens, with liens attaching to the proceeds. After announcing its decision, the Debtor's attorney called to the Court's attention that the confirmed plan gave the Debtor 90 days to list and sell the apartment complex, that he was not sure the 90 day period had expired, and if not, the Court should conduct a court sale. The Debtor's attorney then went on to state that the apartment complex had been listed and an additional real estate commission might be due. At this point WRIGHT stated he represented three of the potential buyers, he had multiple listed the apartment complex, he had done his job, and he should be paid his commission. No mention of an exclusive listing contract was made.

On September 12, 1989, an order was entered approving the Contract Sellers' proposed sale free and clear of liens, with liens attaching to the proceeds. There was a delay in the closing of the sale, and on September 29, 1989, the Contract Sellers filed a motion which sought to extend the closing date, and the purchaser filed a motion requesting an extension of time within which to close the transaction and approving specific terms of the settlement statement. One of the items in the settlement statement was the $90,000.00 real estate commission to the purchaser (TINERVIN). In response, WRIGHT filed an objection to the payment of any commission to TINERVIN on the grounds that he had a superior claim for a commission pursuant to the exclusive listing contract. A hearing was held on the motion and WRIGHT's objection. WRIGHT did not object to extending the time for closing. In fact, he took the position the apartment complex should be sold and the monies paid subject to claims of parties in interest. He also took the position that he was entitled to a commission, and was speaking up to protect his claim, as he did not want to be bound by any court order approving the $90,000.00

commission unless it was clear that he was claiming his commission. At that point he was represented by an attorney who argued, first, that WRIGHT had an exclusive listing contract with the Debtor and therefore the Debtor is liable for a commission, and second, as the listing agent, WRIGHT was entitled to one-half of his commission.[2]

Paragraph 7 of the court approved proposal provides as follows:

> 7. A brokerage fee of $90,000.00 to be paid to Tinervin Rentals, Inc. to be shared by all cooperating brokers. The brokerage fee to be paid at closing.

TINERVIN took the position that WRIGHT was not the listing broker, nor a cooperating broker, that any claims WRIGHT might have against the Debtor based upon the exclusive listing contract are separate from any claims WRIGHT might have against TINERVIN, and if WRIGHT has a claim against TINERVIN he could raise it by suit in state court. This Court indicated in an oral ruling that it was going to permit the sale to go forward on certain conditions, one of which was that TINERVIN was entitled to his commission subject to any claims that WRIGHT might have on the basis of being a cooperating broker, or any claims that he might have to the proceeds based upon the exclusive listing contract. Shortly thereafter, this Court entered an order allowing the sale, which provided in part as follows:

> 3. Credits and expenses of sale are hereby approved and allowed as described in the settlement sheet attached hereto as Exhibit "B" with any commission claims of William Wright, as a cooperating broker, to be determined by a final decision of a Court of competent jurisdiction payable from funds distributed to Tinervin Rentals.
>
> . . . .
>
> 7. That the lien of Champion Federal Savings & Loan Association, Citizens Savings Bank and BancMidwest of Bloomington, Illinois, if any of said liens are allowed as well as any other approved or legally allowable liens including any allowed claim of William Wright

2. One-half of 4%, or 2%, times the selling price which equals a $31,200.00 commission.

against the debtor in possession as a result of the listing agreement shall attach to and be paid from the debtor in possession account created from the net sale proceeds.

8. That any allowed and unpaid liens of Champion Federal Savings & Loan Association, Citizens Savings Bank and BancMidwest of Bloomington, Illinois, as well as any other approved or legally allowable claims, any administrative costs, any claim of William Wright against the debtor in possession as a result of the listing agreement between William Wright and the debtor in possession and any claims of unsecured creditors shall attach to the transferred debtor in possession account and any remaining undisbursed funds in the net sale proceeds account, if any, shall be paid in whatever priority is as hereafter determined by this Court.

WRIGHT filed a claim against the sale proceeds, contending that he had an exclusive listing contract with the Debtor, that the normal and customary practice was to divide a commission, and that he is entitled to 2% of the sales proceeds, or $31,200.00. The secured creditors objected to his claim on the grounds that WRIGHT's claim should be asserted against TINERVIN, who received the $90,000.00 commission, and/or against the Debtor based upon a breach of contract, but not against the proceeds from the sale.

At the hearing, WRIGHT argued there were two issues. The first is whether he had a claim at all. Here he took the position that he does, based upon the exclusive listing contract and Illinois law which gives a realtor holding an exclusive listing contract a commission regardless of whether he is the procuring broker. The second issue is, if he is entitled to a commission, where does the money come from. Here he argued that he is not claiming that he has a lien prior to secured creditors under Illinois law, but that secured creditors must pay their share of administrative costs if they are benefited, and secured creditors did benefit, so they should pay the commission. He also argued that he should not be barred from receiving his commission just

because TINERVIN also received a commission. Finally, he argued that he is looking to the Debtor because his contract is with the Debtor.

In response, the secured creditors argued that under Illinois law, a realtor's claim for commission comes behind secured creditors, that the exclusive listing contract provided two criteria for payment (1) court approval, which was not obtained, and (2) that WRIGHT must be responsible for the buyer, which he wasn't, and that WRIGHT's claim should be directed against TINERVIN or the Debtor but not against the sale proceeds.

The Contract Sellers, who also are claiming an interest in the proceeds, argued that WRIGHT's employment was not authorized by Section 327 of the Bankruptcy Code and Bankruptcy Rule 2014. They also argued that because of the way the exclusive listing agreement was drafted, WRIGHT had no claim for commissions. Specifically, paragraph 3 deleted the reference to a commission being due because of a sale by "anyone else", and this sale was not by the Debtor but through the efforts of the Contract Sellers. They also contend the provisions of paragraph 5 of the listing agreement were not met. Finally, they argued that the listing agreement made the commission subject to court approval, and as the Court didn't accept any of WRIGHT's offers, the commission was not earned.

This Court has gone to great lengths to outline the facts of what transpired in this matter and the positions of the parties in order to deliniate the issue that is before it and the issues which are not before it. What is not before this Court is whether WRIGHT has a claim against TINERVIN based on WRIGHT being the listing agent or a claim against the Debtor for breach of the exclusive listing contract. The issue is whether WRIGHT's claim for a commission against the sale proceeds has priority over the mortgage claims of secured creditors.

WRIGHT's first argument that under Illinois law a broker with an exclusive listing agreement is entitled to the commission stated in the contract upon the sale of the

property regardless of whether the broker was the procuring cause of the sale and that he became entitled to a commission upon the sale of the apartment complex, misses the point. Under state law he may very well be entitled to a commission.[3] But he has cited no authority, nor is the Court aware of any which allows him to claim a lien for a commission on the sale proceeds or that such a lien comes ahead of the mortgage claims of secured creditors. WRIGHT's contract with the Debtor did not provide his commission was to be paid from the sale proceeds, it merely provided for a commission of 4% of the sale price.

▆▆ Under Illinois law a mere claim to a commission does not create a lien on the proceeds. *Mayfield v. Turner*, 180 Ill. 332, 54 N.E. 418 (1899). Furthermore, the terms of payment of a broker's commission is a matter of the employment contract, and in the absence of any contrary provision the payment of the commission is the owner's responsibility. *Webster v. Hochberg*, 105 Ill.App.2d 466, 245 N.E.2d 529 (1st Dist.1969).

▆▆ Therefore, based on Illinois law, it is clear that WRIGHT does not have a lien, let alone a lien that comes ahead of the mortgage claims of secured creditors. Any claim WRIGHT might have is junior to the mortgage claims of the secured creditors. But there are no sale proceeds over what is required to pay secured creditors. In fact, the claim of the most junior secured creditor will not be paid in full.

▆▆ In an attempt to reach the sale proceeds, WRIGHT also argues that where a bankruptcy court is burdened with the sale of collateral in lieu of cumbersome state law foreclosure proceedings and the sale results in no monies for general creditors, equity requires the secured creditors to bear the costs of administration which in this case includes the real estate commission incurred by the Debtor. In order to obligate the secured creditors under Section 506, 11 U.S.C. Section 506, for WRIGHT's commission, WRIGHT must establish (1) his commission is reasonable, (2) it was necessary, and (3) the secured creditors benefited from his efforts. *In the Matter of Trim–X*, 695 F.2d 296 (7th Cir. 1982). WRIGHT's argument fails because he failed to establish the third element. WRIGHT's exclusive listing agreement provided that any proposal he produced was subject to court approval. The proposals he produced were not accepted by the Court. Instead, the Court approved the TINERVIN proposal produced by the contract sellers. It follows that his efforts were of no benefit to the secured creditors. He accepted conditional employment, and cannot now complain if the condition requiring court approval prevents him from recovering a commission.

After paying the senior mortgage holders, the Debtor continues to hold $25,191.71 in a cash investment account, and $4,316.60 in a DIP account, which represents rental income paid to the Debtor by the previous apartment managers after the Debtor filed its Chapter 11 proceeding. The total of those amounts is substantially less than the amount due the junior mortgage holder. Both the junior mortgage holder and the Contract Sellers claim the funds held in the two accounts. They agreed among themselves that if WRIGHT's claim was denied they would settle their dispute by having the junior mortgage holder receive the funds in the two accounts and pay the Contract Sellers $2,000.00 and release the Contract Sellers from their guaranty. The Debtor objected to the junior mortgage holder receiving the funds in the DIP account.

The first basis for the objection is based upon the holding in *In re Neideffer*, 96 B.R. 241 (Bkrtcy.D.N.D.1988). In that case the junior mortgage holder claimed rents pursuant to a provision in the mortgage, rather than a separate assignment, and the value of the real estate was less than the

---

3. This observation should not be construed as this Court's conclusion that WRIGHT is entitled to a commission. That determination can only be made by this Court after WRIGHT has filed a complaint asserting a claim against the debtor.

If such occurs, the probable defense is that WRIGHT's commission was payable only if a purchaser provided by him was approved by the Court, and inasmuch as he did not provide the purchaser, he is not entitled to a commission.

amount of the senior mortgage. The trustee relied on Section 506(d), 11 U.S.C. Section 506(d), to strip away the junior mortgage on the real estate, and argued that as the junior mortgage holder had no claim to the underlying real estate, it had no claim to the rents arising from the real estate. The issue was whether a junior mortgage holder who is completely unsecured as regard to the real estate is also unsecured as to any interest it has in rents arising by virtue of the interest created by the rent assignment in the mortgage. The court held that because the security interest in rents was derivative and not a separate assignment, it did not survive the trustee's Section 506 strip down remedy and because the junior mortgage holder had no claim to the underlying real estate, it had no claim to the rents arising from that real estate.

The Debtor takes a similar position in this case. The junior mortgage holder's claim is subject to being stripped down to the remaining proceeds of sale and as it no longer has a secured claim to the underlying real estate, it has no claim to the rents arising from that real estate.

Just as in *Neideffer*, in this case the junior mortgage holder's claim to rents arises out of the mortgage and not from a separate assignment. However, the claim is different from that in *Neideffer* in that it is not totally unsecured as to the underlying real estate, but is undersecured. That being so, this Court cannot think of any good reason why the junior mortgage holder should be deprived of the benefit of its bargain, nor has the Debtor suggested any. The junior mortgage holder still has a claim against a portion of the sale proceeds against which a further claim against the rentals could attach. Absent the bankruptcy, if a foreclosure had been filed, the junior mortgage holder would have had a claim against the real estate and the rentals, and to the extent the value of the real estate was not used to pay it, the junior

mortgage holder would have been entitled to look to the rentals.

The next basis of the Debtor's objection is founded on the holding in *Rohrer v. Deatherage*, 336 Ill. 450, 168 N.E. 266, that under Illinois law a mortgagor is entitled to the rents until the mortgagee takes steps to enforce its lien on the rents and that the junior mortgage holder has not taken such a step.[4] Illinois law recognizes that a mortgagor is regarded as the owner of the real estate for all beneficial purposes, subject to the rights of the mortgagee. In *In re Southern Gardens, Inc.*, 39 B.R. 671 (Bkrtcy.S.D.Ill.1982), the bankruptcy court applied these principles in holding that a mortgagee had no right to receive rents until it made a demand in the bankruptcy proceedings.

But there is another principle of law which has equal application. Where rents are placed into the custody and control of the law, the priority of the mortgagee will be recognized. *In re TM Carlton House Partners, Ltd.*, 91 B.R. 349 (Bkrtcy. E.D.Pa.1988); *In re DiToro*, 22 B.R. 392 (Bkrtcy.E.D.Pa.1982). Had this Chapter 11 been filed with the purpose of reorganizing the Debtor, the Debtor's position might have merit. However, this has always been a liquidating Chapter 11 with the purpose of selling the apartment complex and satisfying the mortgage holders' claims. As that is the purpose of the Chapter 11, there is no good reason why the junior mortgage holder should not receive the benefit of its bargain by obtaining the rents which were paid since the filing of the Chapter 11. If the case had been filed as a Chapter 7, the junior mortgage holder could have proceeded to lift the stay and reach the rents by proceeding with a foreclosure under state law.[5] By using a Chapter 11 proceeding, a foreclosure was avoided, but the result vis-a-vis the junior mortgage holder was the same—a sale of the real estate with the proceeds applied to the secured debt.

---

**4.** Overruled on other grounds by *Kling v. Ghilarducci*, 3 Ill.2d 454, 121 N.E.2d 752 (1954). However, *Anna National Bank v. Prater*, 154 Ill.App.3d 6, 107 Ill.Dec. 26, 506 N.E.2d 769 (5th Dist.1987) stands for the proposition upon which the Debtor relies.

**5.** Specifically see Ill.Rev.Stat.1989, ch. 110, para. 15–1701 and para. 15–1703.

Furthermore, the Debtor's plan calls for a distribution first to secured creditors and provides that the plan would be funded as follows:

1. Out of its regular business operations to the date of sale of its said property;

2. Collection of rents and cash on hand, which is anticipated to be approximately $14,890.00 on the effective date of Debtor's Plan of Reorganization; and

3. The net proceeds received by Debtor from the sale of said apartment complex.

This provision of the plan is important because it created in the junior creditor a legitimate expectation that rents would be used to pay its secured claims.

Finally, the order confirming the second amended plan provided that the portion of the plan regarding the sale of the property would be confirmed but that the objections by the contract sellers and certain of the limited partners would be reserved. That order further provided that the sale would be free and clear of liens, with the liens and encumbrances to be determined by the Court at a later date. It then provided:

That all other matters pertinent to said Plan, including, but not necessarily limited to any Objections to and/or allowance of any claims against this estate or the classification in said Plan of any Claimholders of Debtor, are hereby reserved and shall be acted upon by this Court once a determination has been made that there will be funds available to make the payments contemplated in said Plan.

These provisions further support the conclusion that the rents were under the "custody of the law" and as such were subject to the priority of the junior mortgagee.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in an Opinion filed this day;

IT IS, THEREFORE, ORDERED:

1. The objections to the claim of William Wright against the proceeds arising from the sale of the apartment complex be and the same are hereby ALLOWED, and William Wright shall have no claim against those proceeds.

2. That the claim of BancMidwest of Bloomington, Illinois, against the funds being held by the Debtor in the cash investment account and the DIP account is a secured claim and the bank is entitled to those monies.