Paul GASKILL, et al., Plaintiffs,

v.

Earl Dean GORDON and Kenneth
F. Boula, et al., Defendants.

No. 88 C 3404.

United States District Court,
N.D. Illinois, E.D.

Aug. 26, 1993.

Lawrence W. Schad, Beeler, Schad & Diamond, Chicago, IL, for receiver.

Thomas I. Matyas, Rosenthal and Schanfield, Chicago, IL, for Mut. Benefit.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Receiver Jeffrey Cagan and Cagan Realty Inc. ("Receiver") brought this motion to establish a $339,096 lien on the Governor's House Apartments ("Governor's House"), with priority over the pre-existing mortgage of Mutual Benefit Life Insurance Co. ("Mutual Benefit"). The Receiver requests such lien as reimbursement for its capital expenditures on Governor's House. Subsequently, the court requested detailed documentation of the Receiver's expenses and further briefing regarding whether the requested expenses should be decreased or offset by the unpaid rents. After providing this documentation, the Receiver moved to amend his petition to increase the lien to $365,755. For the reasons explained below, the Receiver's amended motion for a $365,755 lien is granted.

### Background

This matter arises out of a class action suit brought by Paul Gaskill and Alan Hess on behalf of numerous investors in Financial Concepts, a collection of limited and general real estate partnerships marketed by Earl Dean Gordon and Kenneth F. Boula. The suit alleged securities fraud and other violations against Gordon and Boula, and several entities owned and controlled by them.[1] During the pendency of the suit, the court

---

1. The case settled and on July 27, 1989, the court entered a judgment for $30 million in compensatory damages and $2 million in punitive damages.

appointed Jeffrey Cagan and Cagan Realty as federal receiver to marshal and preserve the assets of Financial Concepts for the benefit of the investors. (Order of July 14, 1988). Specifically, the Order establishing the receivership authorized the Receiver to receive and collect rents, manage and operate numerous properties owned by Gordon and Boula, including Governor's House.[2]

Governor's House is a 96 unit, 92,288 square foot, eight building, residential apartment complex located in the Village of University Park, Illinois ("Village" or "University Park"). Mutual Benefit is the owner and holder of a mortgage on Governor's House in the principal amount of $1,300,000. On October 25, 1988, four months after the Receiver was appointed, Mutual Benefit sought to intervene as a matter of right. In support, Mutual Benefit asserted: "Mutual Benefit has an interest in [Governor's House] and ... is so situated that the disposition of the action may impair or impede Mutual Benefits's ability to protect [Governor's House] and to maintain its mortgage lien." (Petition for Intervention, p. 2). The Receiver countered that "Neither the receiver nor any other party to this action has sought to deny the validity or priority of the mortgage Mutual Benefit holds on [Governor's House], therefore, the disposition of the action will not impair or impede Mutual Benefit's interest in the property." (Memorandum in Opposition to Petition for Intervention, p. 2). The court denied the motion after concluding that Mutual Benefit had not met the requirements of Federal Rule of Civil Procedure 24(a), and that "the collateral is sufficiently protected by the receiver...." (November 3, 1988 Transcript).

2. On March 14, 1989, the receivership was expanded to include Equity Builders Inc. and Riviera Utilities of Arkansas, Arkansas properties owned by Boula and Gordon.

3. In its March 5, 1993 Memorandum Opinion and Order, 1993 WL 64642, the court rejected Mutual Benefit's claims that the Receiver lacked standing, the court had no power to create such a lien, and that the Receiver was equitably estopped from requesting the lien because of its prior representations.

Subsequently, the Receiver requested a first priority lien on Governor's House to reimburse it for $339,096 in capital expenditures. Mutual Benefit objected and emphasized that its first mortgage "would be relegated to a second position without sufficient value in the real estate to satisfy both liens." (Answer of Mutual Benefit to Motion and Memorandum of the Receivership Estate to Establish Priority Lien ("Answer"), p. 1). Alternatively, Mutual Benefit argued that any lien should be offset by the amount of unpaid rents that the Receiver owed.[3]

The court reserved ruling on the Receiver's motion pending review of supporting documentation such as copies of the University Park Building violations which were brought up to code, receipts of the repairs and improvements, and any other documents or affidavits supporting the requested lien. The court also requested further briefing on the offset issue.[4] Shortly after providing this information and reviewing its bills through the end of December, 1992, the Receiver moved to increase the lien amount to $365,755.[5]

### Receivership Lien for Reimbursement of Expenditures

■ The general rule regarding payment of receivership expenses is that the:

[C]osts and expenses of a receivership, including compensation for the receiver, counsel fees, and obligations incurred by him in the discharge of his duties, constitute a first charge against the property or funds in the receivership....

66 Am.Jur.2d *Receivers* § 281 (1973). *See also Donovan v. Robbins*, 588 F.Supp. 1268, 1271 (N.D.Ill.1984) ("As a general rule, the expenses and costs of a receivership are

4. The court had intended to rule expeditiously on this motion. However, after reviewing the facts and law, the court concluded that it needed additional information and time to consider this matter.

5. Although the Receiver moved to amend the petition to establish lien on Governor's House and to establish procedures for 1993 operations, the court treats the latter as an alternative motion. Since the motion to amend is granted, the request to establish procedures is stricken as moot.

charged to the property or fund administered."); *In re Spicewood Associates,* 445 F.Supp. 564, 570 n. 5 (N.D.Ill.1977) ("[F]ees and expenses of a receiver in administering a property are properly chargeable against the owner thereof and/or against the proceeds from the sale thereof."); *Union Trust Co. v. Illinois Midland Ry. Co.,* 117 U.S. 434, 454–56, 6 S.Ct. 809, 820, 29 L.Ed. 963 (1886) (noting that the costs of preserving and managing receivership property may be chargeable as a lien against the property). However, it is clear that "appointment of a receiver does not vest a court with general authority to displace vested contract liens." *Rosenblatt v. Michigan Ave. Nat'l Bank,* 70 Ill. App.3d 1039, 27 Ill.Dec. 370, 374, 389 N.E.2d 182, 186 (1979) (citing *Kneeland v. American Loan & Trust Co.,* 136 U.S. 89, 10 S.Ct. 950, 34 L.Ed. 379 (1890)).

The issue in this case is whether the court may establish a first priority lien to reimburse the Receiver for repairs and improvements on Governor's House. After reviewing the rather scarce authority on this issue, the court determined that it could properly award a first lien for receivership expenses superior to Mutual Benefit's pre-existing mortgage if it was "fair and appropriate based on the facts and circumstances of this case." *Gaskill v. Gordon,* No. 88 C 3404, 1993 WL 64642 *4, 1993 U.S.Dist. LEXIS 2888 *12 (N.D.Ill. March 5, 1993). *See generally* 66 Am.Jur.2d *Receivers* § 282 (collecting cases discussing courts' discretion to establish priority receiver's liens to pay for costs of preserving and caring for receivership property). *See also Cody Trust Co. v. Hotel Clayton Co.,* 293 Ill.App. 1, 12 N.E.2d 32, 39 (1937) ("[T]he question of making receiver's certificates a first lien superior to prior vested liens, is purely an equitable one, and to be determined upon just and equitable principles, as the circumstances of the case shall warrant."). In making this determination, the court noted that it would weigh the documentation verifying the expenses, benefit to the property, and mortgagee's acquies-

cence in the Receiver's management.[6] *Gaskill,* 1993 WL 64642 at *4.

In its first brief, the Receiver argued that it was entitled to a first priority lien because "all of [the] costs and expenses have added value to the property … [and] "[t]he mortgagee, Mutual Benefit Insurance Company, was aware of the appointment of the Receiver, has never objected to the appointment of the Receiver, has not tried to have its own receiver appointed, nor until recently has it attempted to foreclose its mortgage." (Receiver's Motion to Establish Lien on Governor's House Apartments ("Motion"), p. 14). The Receiver also maintained that:

> The expenditures which the Receiver made to correct code violations and to keep the property in compliance with the Village of University Park codes were required to be incurred by the Receiver in order to discharge his obligations under 28 U.S.C. Section 959(b) which requires that a receiver shall manage and operate property according to the requirements of the valid laws in the state in which the property is situated in the same manner as an owner or other possessor would be bound to do. Pursuant to federal law, the receiver was without discretion to choose to incur or not to incur the expenses which were necessary to place the property in code compliance.

> Furthermore, the mortgage itself in Section 2 required the Receiver to keep the property in good repair and in compliance with all building codes.

(Motion, p. 14). Lastly, the Receiver emphasized that if it had not corrected the code violations, University Park would have condemned the property or made the repairs and imposed its own lien.

The Receiver has now provided documentation in support of these claims. For example, Ex. A to the Receiver's Brief Regarding Offset for Gross Rents ("Receiver's Brief") contains affidavits from Jeffrey Cagan and Walter Shelton ("Shelton"), Code Enforcement Director for the Village of University

---

**6.** However, the court also advised the Receiver that it should seek prior approval of significant expenditures so that the court can hear objec-

tions and determine the propriety of extraordinary expenses *before* they are made.

Park.[7] Shelton's affidavit confirms that deficiencies in the design and construction of Governor's House has led to numerous problems with plumbing, heating, and outside maintenance. (Shelton Aff., ¶¶ 3–7). Shelton also notes that during his tenure, "the Village has worked closely with the Receiver in correcting property deficiencies." (Shelton Aff., ¶ 7). Also, Shelton explains that University Park stepped up its inspection procedures in 1991, and that prior to that time, "some formal citations for violations were issued, but in many other instances the Receiver was working informally with the Village to correct violations on the property." (Shelton Aff., ¶ 8). Specifically, in ¶ 9 Shelton states that:

b. The Receiver worked to repair the damages caused by burst water pipes and failure of hot water heaters to function in cold weather.

c. The Receiver made improvements to the interior of the property including: replacement of interior carpeting; upgrading of interior hallway lighting; repair or replacement of doors and door frames; upgrading of stair rails; and replacement and strengthening of patio screens and patio railings.

d. Finally, many of the appliances in the apartments were not in proper working order and/or constituted health hazards. The Receiver was required to repair and/or replace appliances.

e. Many of these improvements, repairs and renovations were undertaken based on conversations between the Village of University Park and the Receiver ...

(Shelton Aff., ¶ 9b.–e.). If the Receiver had failed to make the repairs, Shelton indicates that the Village would most likely have issued an arrest warrant for the Receiver to come into court, arranged to have the work done, and filed a lien against the property for doing the corrective work.[8] (Shelton Aff., ¶¶ 10–11). Lastly, Shelton states that in his opinion, "the property is in substantially bet-

ter condition today due to the efforts of the Receiver." (Shelton Aff., ¶ 12).

Exhibit B provides documentation supporting the statements made in Jeffrey Cagan's affidavit. In particular, Exhibit B contains numerous inspection reports on Governor's House. (Ex. B, Tab 1) The majority of these reports were made in 1991, but there are also several reports documenting violations in December, 1988. Most of the violations in 1988 were for the poor condition of building siding and trim, porches, doors and windows. (Ex. B, 1–1 to 1–17). The exterior 1991 reports document peeling and blistering paint, and problems with gutters, doors and windows, screening, and porches. (Ex. B, 1–23 to 1–31, 1–55 to 1–60, 1–102 to 1–108). Many of these exterior reports also indicate the need to replace carpeting and provide fire extinguisher and smoke detectors. (Ex. B, 1–29 to 1–32, 1–36, 1–42, 1–47, 1–48, 1–99, 1–101, 1–104). Several problems with the heating system were also noted. (Ex. B, 1–32, 1–38, 1–53, 1–61, 1–62, 1–104). However, the numerous 1992 interior inspection reports support the Receiver's assertion that the necessary repairs were made. (Ex. B., Tab 2–1 to 2–65).

In addition, Exhibit C provides a detailed accounting of the expenditures made at Governors House from 1988 to 1992. This group exhibit includes an expense index for the years in question, and a section-by-section breakdown of the total amount spent on 1) appliances, 2) carpeting and interior renovations, 3) plumbing and heating, and 4) roofing and outside work each year. (Ex. C, Tabs 1–20). Moreover, each tabbed section contains the invoices from the companies that provided the products and services. This exhibit corroborates the Receiver's claim that a total of $365,755.28 was spent from 1988 to 1992.

██ However, Mutual Benefit raises several objections. First, Mutual Benefit argues that the Receiver has not established that the property increased in value by any

---

7. Exhibit A also includes a graph of the increase in rental income which was prepared by Jeffrey Cagan.

8. In fact, the Village did file a suit against the Receiver, but they worked out the problems and the suit was dismissed. (Shelton Aff., ¶ 10).

of the expenses they seek to charge. (Response of the Mutual Benefit to the Receivers' Submission under the Court's Order of March 5, 1993 ("Response"), p. 1). The court rejects this objection because the Receiver need not show that each dollar in painting or repairing corresponds to a specific dollar increase in the "value" of the property. Rather, this court finds that it is sufficient if the Receiver shows that some benefit was derived from the expenditures. For example, in *Donovan v. Robbins,* 588 F.Supp. 1268 (N.D.Ill.1984), the court rejected the claim that the receiver's right to compensation was contingent upon the value conferred on the receivership property. There, the court noted that "although the receiver may not have increased the value of the property administered, the receiver diligently and successfully discharged the responsibilities placed upon him by the Court...." *Id.* at 1273. Analogously, the expenditures made in this case prevented the Village from placing a lien on Governor's House. Also, the Receiver's monthly reports indicate that Governor's house had a positive cash flow of $45,110 for 1992. This is significant because the property produced negative cash flow prior to that time. Further, Shelton confirmed that Governor's House is in "substantially better condition." (Shelton Aff., ¶ 12). Given these facts, the court concludes that the Receiver has made a sufficient showing that his decision to make these expenditures conferred a benefit on the property.

The court also rejects Mutual Benefit's unsupported allegation that the Receiver is seeking a lien for "self-produced" building code violations. (Response, p. 2). Specifically, Mutual Benefit claims that the Receiver cannot ask for reimbursement for expenses before December 1988, because there were no formal building code violation reports prior to December 12, 1988. (Response, p. 4). Moreover, since the next inspection reports are from 1991, Mutual Benefit claims that the Receiver cannot make claims for 1988 to 1991. In short, Mutual Benefit contends that

the Receiver should not be reimbursed for making repairs that were necessitated by the Receiver's mismanagement. The court does not agree.

The invoices in Exhibit C show that the Receiver replaced appliances, painted, replaced carpeting, and repaired wall plumbing, siding and trim in 1988 through 1992. There is no evidence that poor management caused the code violations. Rather, Shelton, the Code Enforcement Director for the Village indicated that the need for repairs was primarily due to "deficiencies in the design and construction of the buildings which make them ill-suited to the climate of northern Illinois." (Shelton Aff., ¶ 4). Shelton also stated that the pipes are prone to repeatedly freezing, and that it is necessary to break through concrete flooring to repair them. (Shelton Aff., ¶¶ 5–6). Further, Shelton explained the lack of formal inspection reports by noting that the inspection procedures were stepped up in 1991, and that prior to that time, "the Receiver was working informally with the Village to correct violations on the property." (Shelton Aff., ¶ 8). Consequently, the court finds no merit to Mutual Benefit's argument that expenditures made in certain years should be discounted.

Moreover, the court rejects the claim that most of the expenditures are unrelated to the code violations.[9] The vast majority of expenditures correlate with the cited violations. For example, the expenditures for carpeting, heating, painting, and outside work clearly correspond to the citations regarding heating, dangerously damaged carpeting, unstable porches, and splintering paint trim. (*Cf.* Ex. B; Ex. C). Although it is true that there are no cited violations for faulty "appliances," the court will not strike these figures because Shelton explained that some violations were made on an ongoing and informal basis. (Shelton Aff., ¶ 8). In addition, Shelton's affidavit expressly states that "many of the appliances in the apartments were not in proper working order and/or constituted

---

9. However, Mutual Benefit correctly notes that the figures submitted in Ex. C do not correlate with those submitted in the Receiver's original motion for a lien. The court considered this factor, but is sufficiently convinced that this discrepancy is due to the fact that the Receiver was able to correct previous errors and oversights when it reviewed its invoices and prepared the submission to this court.

health hazards. The Receiver was required to repair and/or replace appliances." (Shelton Aff., ¶ 9d).

Lastly, Mutual Benefit's argues that:

The Receivers are asking this Court to charge the mortgagee's property interest for the cost of operating the Property simply because it is mortgaged.... Indeed, if the Property was operating at a loss (as the Receivers now allege), then the Receivers should have advised the Court of that fact and should have recommended abandonment of the Property to Mutual Benefit long ago—and should not have accrued expenses for over four years, only to belatedly ask the court to charge Mutual Benefits' interest for those expenses.

(Response, p. 11). The court finds the most merit in this argument. It is quite true that it would have been much easier for the court to assess the need for various expenses before they were made, rather than several years after the fact. This is especially true in light of the fact that the court now knows that "due to the design of the property ... it is likely to continue to require a high degree of maintenance to keep it in code compliance." (Shelton Aff., ¶ 7).

However, after much deliberation and review of the supporting documentation, the court will grant the Receiver's motion for a $365,755 lien. The court certainly does not displace Mutual Benefit's prior lien lightly, but it will grant the Receiver's motion based upon the Receiver's corroborating documentation of expenses, and evidence that the expenditures benefitted Governor's House. The court also notes that although Mutual Benefit did seek to intervene in 1988, it essentially acquiesced to the Receiver's management because it did not attempt to have its own receiver appointed or to take possession of the property until November, 1992. It is also appropriate to grant the lien in this instance because the court gave the Receiver broad powers to marshal and preserve the assets of Financial Concepts such as receiving and collecting rent, and managing and operating the various properties. (Order of July 14, 1988).

In sum, the court will grant the requested lien for reimbursement in this case. However, in the future, the Receiver should seek prior approval of significant expenditures such as these.[10]

### Offset of the Receiver's Lien

The only remaining issue is whether the amount of the Receiver's lien should be offset by the rents that have been generated since the mortgage default in February, 1992. Without benefit of authority, Mutual Benefit argues that it is entitled to offset now because it would have been entitled to the rents, but for the court's stay of its motion to appoint a receiver. (Response, p. 8). Conversely, the Receiver reiterates that Mutual Benefit is not entitled to the rents until it has taken possession of the property. (Receiver's Brief, p. 2). In support, the Receiver cites *Anna Nat'l Bank v. Prater*, 154 Ill. App.3d 6, 107 Ill.Dec. 26, 33, 506 N.E.2d 769, 776 (1987).

In *Anna*, the court noted the "well-established Illinois law" that a mortgagee's rights to rents and profits "may be enforced by the mortgagee upon default by taking possession of the mortgaged property." *Id.* As the Receiver notes, this case clearly suggests that the mortgagee may only enforce its rights when it enters into possession or has its own receiver appointed. Mutual Benefit has cited no contrary authority. Therefore, the court concludes that offset of the Receiver's lien by the amount of unpaid rents is inappropriate.

### Conclusion

For the foregoing reasons, the Receiver's motion for a first lien on Governor's House in the amount of $365,755 is granted. Consequently, the Receiver's motion to establish lien on Governor's House is granted and the motion to amend petition to establish lien on Governors House is also granted. The motion to establish procedure for 1993 operations is stricken as moot. Lastly, the stay of

---

**10.** In its 1992 Year End Report, the Receiver stated plans to liquidate the Receivership in the next 18 months. The court is also committed to liquidating this receivership in the next year.

Mutual Benefit's request to have a receiver appointed is lifted.